May it please the Court. Good afternoon, Your Honors. My name is Fred Goldsmith. I represent Mon River as that term has been defined in our briefings to include four different entities. And with the Court's permission, I would like to reserve three minutes for rebuttal. Your Honor, I stand ready to answer any of the Court's questions. Subject to the Court's issues, which I aspire to address today, the first concerns the continued viability of the Ryan Doctrine itself. The second concerns whether or not the Ryan Doctrine has any place in the tug-toe setting, given the Supreme Court's decision in Stevens v. the White City. Is Smith a covered employee under the Longshoremen and Harbor Workers' Compensation Act? Absolutely not, Your Honor. Why not? He was a Jones Act seaman. He was an employee of Mon River Towing. The Longshoremen and Harbor Workers' Compensation Act and the Jones Act are expressly mutually exclusive because the Longshore Act excludes in its definition of uncovered employees the members of the crew of a vessel. It doesn't make any difference for purposes of Ryan, though, does it? What his status was? Yeah, does it make a difference? I mean, has Ryan been applied to Jones Act cases as well as to cases, Steve Dorian cases like Ryan itself was? Your Honor, to my understanding and research, the Supreme Court has not applied Ryan in a seaman case. I don't think that was the question. The question was, has it been applied? And it has been applied to other contractors, but not in those kinds of situations. I apologize, Your Honor. I thought Judge Jordan asked if it had been applied in Jones Act cases. But it has been, if it is never, and you said the Supreme Court, has it ever been extended to Jones Act cases? Not by the Supreme Court. By any court? Yes, it was by this court in Cooper v. Loper. This court applied Ryan involving a contractor who was a dock owner. So doesn't that undercut your first, the first point you said you were going to raise? I think you only told us two of them because the first question interfered, but we'll get to the other two. But doesn't the fact that you just cited Cooper v. Loper and what it said on the application of Ryan show that whatever any other circuit may think of the Ryan doctrine, it's alive and well in this circuit? Well, not well, it's alive in this circuit. We have not taken it to task at all. Your Honor, you haven't yet. And I'm here to provide you the opportunity to do so. Why would we do that if it's on its death rattle elsewhere? And isn't it really the Supreme Court that can overrule its own doctrine? The Supreme Court has stated in the Edmonds v. Company General Transatlantic decision in 1979 that the Congress, through the 1972 amendments to the Longshore and Harbor Workers' Compensation Act, their words overruled other Supreme Court decisions spoke in terms of abolished the Ryan doctrine and Syriac. That was one of its holdings, but you just conceded that Smith is not covered by the act. And thus the amendments, the act and the amendments don't apply to him. Your Honor, this is my point in my briefing. The whole animating purpose for the Ryan doctrine was to correct an inequity that the court found present in those circumstances. Assume we agreed with you and your briefing, which we've read. How do we get around Cooper? I mean, you're speaking to us as if we were free to ignore a precedential opinion of this court. Cooper says what it says. It applies it. It applies Ryan indemnity in a Jones Act case, right? Correct. There is a critical distinction, Your Honor. The tug tow? That's it. The tug tow line of cases is not just this court's, which it is. It's also entrenched. It's Supreme Court precedent, which if this court applied Ryan in the tug tow context, it would be disregarding Supreme Court decisions going back to 1870 with the Steamer Syracuse, the John G. Stevens in 1898, and Stevens versus the White City in 1932. Well, your opponent's press on us, the White City was strictly a property damage case. It had nothing to do with the kind of personal injury indemnities that Ryan was intended to deal with and that Ryan's a later case, and if they had intended to exempt tug tow kinds of issues, they'd have talked about it, but they didn't because they were dealing with something different, personal injury. I'm extrapolating freely, but I take that to be their argument. First of all, Judge Jordan, the Stevens case does not stand alone for the proposition that a tug owes its tow only a tort non-contract duty, and as to the issue specifically that you raised and that my so the argument goes in the personal injury context, in the case, the John G. Stevens in 1898, the U.S. Supreme Court spoke in terms of safety of passengers, and passengers presumably are concerned about their safety because of personal injury reasons. Further, this court in the Geertsen decision in 1955, which we cited in our briefing, spoke in terms of the tug tow relationship in a personal injury and property damage decision. Well, we certainly have cases from other circuits, don't we, that apply Ryan, in the tug tow context? It has happened in limited circumstances, and I'd be pleased to speak to those circumstances, Your Honor. Well, I'd be happy to hear it. I mean, the Fifth Circuit is not meaning no disrespect. There's some to-ing and fro-ing and back-ing and forth-ing, but it does seem like there are other circuits out there that have treated White City, at least silently treated like it doesn't count when you're talking about personal injuries here. For instance, the tug Manzanillo decision from the Ninth Circuit applied Ryan in a tug tow setting, but either because the parties, the litigants, did not raise the issue of Stevens versus the White City and its predecessor cases and its progeny, or because the court simply chose to disregard that line of cases, that decision doesn't even mention the case Stevens versus the White City. Many of the other decisions of other circuits and other district courts, which have applied Ryan in a tug tow context, have either done it without any reference or recognition of even the existence of Stevens versus the White City, or they have somehow tried to marginalize it, as my opposition did, but they didn't. We should be the first to do thoroughly what you suggest has not been done before. Your Honor, the towing industry needs to know whether or not Ryan applies when it does business, when it settles cases. Deckhands on towboats and barges are some of the most litigious class of personnel out there. Those cases get settled all the time. If there is a Ryan exposure moving forward in the tug tow context, if there are two defendants, the barge owner and the tug operator employer, that tug operator employer is going to be very reluctant moving forward to settle a case that doesn't include a settlement by the barge owner as well. Well, I guess you just said that really nobody's treated the White City the way you want us to. You say, and in response to Judge Berry's comment, if I understood you correctly, you're saying, well, people don't know how to act. But if other circuits have been treating these folks the same way every other marine contractor gets treated under Ryan, wouldn't we be the ones throwing uncertainty in the system by suddenly taking them out of the system that they have otherwise been treated as being part of? I don't think Your Honor fully describes the lay of the land as far as circuit court decisions on that issue. The Fourth Circuit in the Cargill v. C&P decision plainly addressed this issue, tug tow, Ryan, and it said in the face of Stevens v. the White City, Ryan could not apply in that context. Interestingly, the Cargill v. C&P decision implicitly then overruled prior decisions which Ingram and the District Court relied on, yet did not cite or describe how it could find its way around the Cargill v. C&P case. So, yes, there are other courts that have recognized it. Further, the Fairmont case out of the Second Circuit, which was decided before the Lebrano decision in which the Second Circuit did a substantial gutting of Ryan, the dissent in that case spoke of Stevens v. the White City essentially saying, how can we do this? How can we apply Ryan in a towing case in the face of that decision? You're running out of time and you still have two points you want to cover, but let me just ask you this question. You would not disagree that the purpose of the Ryan doctrine is to place the burden on the company who causes the fall, correct? Correct, Your Honor. You describe, you claim you're innocent. You argue at one point, and that's the word you use, you say Ingram asked his court to shift the cost of defense from one innocent party, Ingram, to another innocent party, Long River, correct? Correct. Now, in your reply brief, you call yourself a tortfeasor. Correct. Which are you? Are you a tortfeasor? Yes, I'm guilty. My client is guilty of being an alleged tortfeasor. But Ingram is clearly not guilty of anything. Ingram was a co-tortfeasor. Well, what did Ingram do? It seems to me reading this case that Smith admitted he was solely negligent. It was all his fault. And if there has to be a guess, I would say it would be Mon River for hiring a negligent seaman. And his negligence should be attributed to you. And it's not much more complicated than that. Tell me why I'm wrong. Ingram made that very argument. Good argument. I just made it myself. That Mon River, you're negligent, you breached the warranty of workmanlike performance because you hired essentially this thug with this criminal history, with a DUI history. No, no, no, no, no, no. That's not what I'm saying. I know that's what they said. I'm saying he was on the barge and he admittedly messed up. It was his negligence on the barge. You are the employer of a negligent seaman. Two answers, Your Honor. I'll be very brief because I understand my time is caput. First of all, this court held in Shaw versus Lauritzen, 1970, that the conduct of the employee is just a factor to be considered. It's not dispositive. In other words, it's not a strict liability situation. Your guy has an accident, you're Supreme Court did discuss and the district court cited how, and Your Honor just mentioned the rationale, that liability should best fall on those who can prevent it. We have to go look at what the district court found. Both the special master and the district court were effusive in cataloging in great detail all the things that Mon River did right. The only thing that one can even infer from the special masters and the district court's opinion is that it was the mere momentary carelessness of Smith himself, which equates to the breach. And that's in consistence with this court's analysis in the Shaw decision. You said that Ingram didn't ask for Ryan immunity in the lower court, but where did you raise that in the lower court? Raise Ryan? Where did you raise the issue with the lower court that Ingram didn't ask for Ryan immunity? Did you bring that up with the lower court? The issue is as fair notice, Your Honor. I do not believe that that issue was squarely presented to the district court. Should we consider it then? In candor, I think this court should consider it for two reasons. One, this court is empowered under its precedent to review on appeal matters that are of legal significance, even though they may not have been properly preserved below. Secondly, I mentioned in the brief in terms of equity, Ryan is essentially an equitable doctrine the Supreme Court devised to correct what it viewed as an inequitable situation. Here, Ingram wants to come in and invoke equity.  That's the rationale, Your Honor. I want to ask about a case that didn't get really any play from you folks, but I looked at it and I wondered why not. There's this case, Humble Oil versus Philadelphia Ship Maintenance Company, a precedential opinion from 1971, 444 F. Second, 727, and Judge Aldisert said in that case, after reviewing some immunity decisions and indemnity issues, the following, quote, once a condition of unseaworthiness is established in a direct action against the ship owner, the burden falls on the owner to demonstrate certain things. And then he goes on to say, the burden then shifts to the stevedore to demonstrate that action or inaction by the ship owner is called into play, thus precluding any Ryan right to indemnity. Now, when I read that, I wondered, does that mean that in this circuit one has to establish unseaworthiness as a precondition to getting Ryan indemnity? Do you have any view on that at all? And I know I'm catching you short, so if you don't, it's fine for you to say no. I can't answer your question to a certain extent, hopefully somewhat intelligently. I confess that I'm not intimately familiar with that particular decision. What I think you're asking, Judge Jordan, is need Smith have recovered on his unseaworthiness claim against Ingram for Ingram to be able to seek Ryan indemnity? Not just need he have recovered. The question in my mind is, do you have to have made out the claim to begin with? Not necessarily taking it all the way to recovery, but is it a prerequisite to ever getting to the question of Ryan indemnity that you have shown unseaworthiness? Yes. Yes. This court held, and it's on page 26 of our fourth step brief, in the Kaminsky and in the Williams decisions that unseaworthiness exposure is a What do you do with the years of legal action that had to be undertaken by Ingram to defend against an invalid or a claim that was concededly invalid? Well, I have a few thoughts on that, Your Honor. First of all, it's interesting that Ingram did not move for summary judgment early on on its exposure to an unseaworthiness claim. It may be that it did that because it didn't want to damage its Ryan claim. The other reason is we settled. We thought we were entitled to be out of the litigation under the McDermott v. Amcly decision and under the Stevens v. White City decision. And in fact, the district court warned me not to try to get out, but I didn't think that I could represent my client properly and not try to get out basis Stevens v. White City and McDermott. That unseaworthiness was really in until the end when the court ruled. It was there. It may not have been the greatest claim in the world, but it was excellent. The facts of the case and Smith's relationship to that barge, everybody knew them at the beginning. Maybe, but the claim was really there till the end. The court said it's out. It was never a legally legitimate claim. I understand what Your Honor is saying, but the case law on whether or not the exposure is enough to entitle the ship owner to Ryan have made a distinction between an illusory claim and one that is legally proper. This claim never was legally proper. This was never a potential liability. Smith was never a potential liability. Has there ever been a case you think was wrongly decided? It's always potential liability until there's no liability. You may say there shouldn't be any potential liability, but it's there. It's there. Your Honor, it has to be a legitimate claim. Otherwise, who decides that? Suppose the judge says, I think that's a legitimate claim. You think the judge is nuts. Does that make it? It's never done until it's done. The Supreme Court decided that issue in the Chandra's versus Latsis case. The Fifth Circuit expounded on that issue in the harbor towing case. Smith never had a legal right to bring an unseaworthiness claim against Ingram. Ingram itself made that argument below and joined in Tri-River's motion in limine to the special master saying that we have no unseaworthiness exposure. Mr. Fornella may tell us because I'm going to ask him the question. Perhaps Smith was on that barge long enough so that he could bring an unseaworthiness. He was effectively a crew member. He was there for a sufficient period of time and he could bring a seaworthiness claim. I'll ask him the question. By the way, you're way over time. Is there anything you'd like to say quickly? No, you've put up with me long enough for now. I'll come back in a few minutes if you'll put up with me. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. I am Leonard Fornella and I am here today representing Ingram Barge Company, who is the appellee with respect to the main body of this case and the cross-appellant with respect to a piece of the case that's collateral with respect to additional fees. You know, we've kicked just about every pin out underneath Ryan. Can it really stand anymore? Is the foundation shot to such an extent that we shouldn't find it? No, it is not. Mon River Towing's entire argument to this Court in his briefs is what I call aspirational. It is Ryan is there. It's vital. It continues to be recognized by the Supreme Court. It continues to be recognized by Courts of Appeal. When was the last time it was recognized by the Supreme Court? Well, actually, there's a citation. Sixteen years ago. It was recognized and again, I have the reference in the Lockheed case in 1983. The Lockheed case, Lockheed, it's 460 U.S. 190 and that is recited in the case that we have in our brief that talks about the Stevens case. It's the Walters versus Tidewater case. It hasn't been overruled. No, it absolutely has never been overruled and that's the point. The Supreme Court has had decided Ryan in 1956, I believe, and since that time, there have been numerous cases that have come before the Supreme Court where it could have said, you know what, we're going to eliminate Ryan completely. They've never done that, ever. And the Ryan indemnity was only affected by the 72 amendments with respect to Longshoreman and that's clear. With respect to the very reason that it came into existence, right? I mean, Ryan came into existence because of the kind of accident which was taken, which Ryan then took account of and which was then taken out of the mix by the 72 amendments, right? Except that the Supreme Court never came back and said when it addressed those issues in subsequent cases as to what the effect of the 72 amendments was, the Supreme Court didn't say it's effectively abolished everything. It said it only has to do with the issue involving a longshoreman and this was the trade-off that occurred. A longshoreman could sue a ship owner for unseaworthiness before the 72 amendments. 72 amendments took out the unseaworthiness claim but still allowed the longshoreman to sue the vessel for negligence. But let me ask you this. With reference to the Supreme Court's reliable transfer case where they got rid of the divided damages rule, the peroration of this case has some language that I'd be interested to get your reaction to in this context. They said the rule of divided damages and admiralty has continued to prevail in this country by sheer inertia rather than by reason of any intrinsic merit. The reasons that originally led to the court's adoption of the rule have long since disappeared. The rule has been repeatedly criticized by experienced federal judges, et cetera, et cetera. Why isn't that language which could be with absolutely equal force applied to Ryan? Because Ryan is a limited situation dealing with a contractual relationship between two companies where there is an implied warrant for work and life service. The issues that you're speaking about generally refer to joint tort feasors who don't have that relationship or two separate joint tort feasors. I took the court to be saying not some distinction between implied contract and torts. Incidentally, a distinction which probably would have stuck in Justice Black's craw given his dissent in Ryan to start with. But I took the Supreme Court's peroration and reliable transfer to be saying we can do better than this sort of blunt instrument that just throws the liability all on one party for no other reason than that admiralty has done that for a long time. What's the rational reason to give Ryan legs in this context? What's the economic rationale for doing it? I understand you can say, hey, it's the law. The Supreme Court says do it. We could argue about that. But what reason or rationale is there for Mon River bearing this liability as opposed to you bearing this liability or somebody else? The rationale is simple. And it's been said in many cases, including Supreme Court cases, the rationale is that when you have a contract, and again, I'm talking about the situation involves a contract between two companies, the contractor who is in control of the ship, who's in control of the situation, is in a better position to avoid accidents than the shipowner. That's the rationale. That's why it's different than the traditional two joint torque fuses who don't have that relationship. And that's why it's continued to be vital. So the loss is best imposed on Mon River because they're the ones who could make a judgment about hiring somebody like Mr. Smith. Well, it actually doesn't actually go to the question of whether they were negligent in hiring him. It goes to the issue of they had control of the operation. They employed him. They trained him. They supervised him. He was part of their crew. They were doing the harbor work at the time. They had control of the situation. They were the person, not Ingram, who wasn't there. They were the entity, Mon River was, that had control of the situation and had the ability to control whether or not the accident happened. And why should seaworthiness, if that's the rationale, what does seaworthiness have to do with it? What does seaworthiness have to do with it? Yeah, I mean, Humble Oil and Kamensky and some other cases seem to imply that this is an indemnity associated with an unseaworthy condition. The rationale you've just described does seem to say they should just get it because they get it. I'm not sure that that really is, that phrase has been used in the Fairmont and some other cases talking about unseaworthiness. But the Ellermann case, to answer the question you asked earlier in regard to Humble Refining, the Ellermann case is a Third Circuit case that says that even, that the shipowner can get recovery of his attorney's fees against a contractor that breaches the implied warranty, even if the shipowner is exonerated or is found not liable for the underlying case. But the point is that in regard to this unseaworthiness issue, that's, no court has ever said, as Judge Barry was asking before, that you have to actually go all the way through and be found unseaworthy before you can collect. I mean, the issue is you're being exposed to a claim from somebody. But you concede it wasn't a very good unseaworthiness in this case. Well, that's the interesting thing about this. As Judge Barry indicated, the Special Master said that it is a close question, I'm not going to answer it, it is a close question as to whether Mr. Smith in this case was a seaman with respect to Ingram and would be able to assert an unseaworthiness claim against Ingram as part of the crew of those barges. Decided, didn't have to decide it because he found that there wasn't unseaworthiness. I said I was going to ask you the question. You would have to, if I asked you whether or not Smith's contacts with the barge were substantial enough to assert a seaworthiness claim and therefore a Ryan doctrine claim, you would, I think, have to say yes. Wouldn't you? Well, what I'd have to say is that both Smith and Mon River throughout the litigation argued two things in that regard. One is that Smith was a Jones Act employee of Ingram because of a kind of a shared joint employment situation and also because he was attached to that fleet of barges. Because our barge was not found to be unseaworthy and Ingram was not found to have been negligent, that issue was never raised or never gotten to. But the point is both Mon River and Smith continued to press throughout the litigation that, in fact, there was an unseaworthiness claim that was viable against us. In fact... Assume we were, just for the sake of discussion, that we weren't going to accept the judicial estoppel argument here. So the fact that they said it below, just for purposes of discussion, leave that aside. What's the legal basis that you have for saying, well, we were exposed here? They make the assertion that you were never exposed for two reasons. One, that there was nothing to indicate that the vessel was unseaworthy, and two, that he wasn't a seaman. And either way, there was no exposure, so you shouldn't be getting indemnified. But that's theoretical, Your Honor. You don't know that until the case is decided at the end. Throughout the course of the case, they were making those very points, that we should have been held liable for unseaworthiness because he was a seaman, asked us, because he was attached to our fleet of vessels. So you never know that until the end when it's resolved. Meanwhile, we have to defend ourselves the entire time through those claims. So what does exposed mean? Is it theoretical, or does it mean you're actually exposed to it? No court has ever really come to the issue of defining what, quote, unquote, exposed means in that theoretical, practical fashion. Although a number of courts who have addressed it have said, you can't just look at it from hindsight. You have to look at it from foresight. Throughout the entire time of this proceeding, whether it was meritorious or not, they were making the claim. And in fact, at one point, they attached to one of their briefs a case from a Kentucky court, and that Kentucky court found that a seaman could, a non-employee seaman could, in fact, maintain an unseaworthiness claim against a non-employer's vessel. So there is some body of law out there that might suggest that could happen. Now, how about the assertion that if we went with you, we would be extending this into the tow-tug arena where it hasn't been before and doesn't belong? Well, absolutely, you're not extending it. There are a number of cases that have applied, Ryan, in a tow-tug situation. And I would call the court's attention, I'm sure you've read it already, to Judge Standish's wonderful opinion that he issued in October of 2005, where he discusses all of these issues and discusses all of the cases that have, in fact, held that Ryan does imply in the tug-tow situation. The Stevens v. White City, upon which Mon River relies, was a 1932 case. It was simply a claim by a tug against the tow, I'm sorry, by the tow owner against the tug, saying that you damaged my tow and therefore you have to pay me. There was no discussion of the implied warranty because it didn't exist yet. It wasn't formulated until Ryan came along in 1956. And the holding there was based upon the fact that the tow maintained control over its own vessel. The court spoke in pretty broad language, though, didn't it, Mr. Fornello? The court said very broadly, hey, the relationship between tug and tow is, what, ex delicto, not ex contracto. I mean, they were very specific in saying this is not a relationship where the duties flow from anything but general tort liabilities. I would disagree. They said that. But if you continue reading in the case, Your Honor, with all due respect, if you continue reading in the case, they talk about the fact that there was somebody on the tow who had control. So they said this is not a situation, it's a different situation than normal bailey-baylor because the tow maintained control. Getting into that case, then, the Stevens case was 1932. It's never been utilized elsewhere. Ryan comes along, doesn't really address it. Numerous cases since Ryan have applied the indemnity, the implied indemnity in a tug-tow situation have criticized Stevens. The Walters v. Tidewater case. They may criticize it, but it's Supreme Court authority on the books. On one hand, you tell us we can't ignore Ryan because it's Supreme Court authority on the books. On the other hand, you seem to be telling us what you can ignore White City because a lot of other courts did, too. But White City doesn't apply to this situation. White City did not involve a personal injury claim. It didn't involve alleged joint tort feasors. But it didn't say it was just limited to property damage, did it? No, but it was property damage. I realize that. We'd have to extend that case, then, to fit this one. You'd have to extend that case to fit this one because it didn't, the facts of that case and this case are completely different. That case involved a tug and a tow, a claim by the tow against the tug that you damaged my vessel. That's it. It wasn't a personal injury case. It didn't involve joint tort feasors. It didn't involve indemnity issues. It didn't involve implied contracts. It didn't involve anything like we're dealing with today. Well, when you say it didn't involve implied contracts, it could as easily have involved implied contracts as Ryan, right? I mean, the folks in that case, the plaintiff in that case was trying to say, I've got some, they've got some obligation to me beyond tort liabilities. And the Supreme Court said, no, they don't. Well, I can't remember the exact language, but it's sort of a since time immemorial, it's a tort, not contract. Understood in that particular context of that case. But again, that was a 1932 case. Ryan was decided later and there was nothing in that case that's even remotely similar to this case. And again, I urge you to go back and look at it because it was based upon the degree of control, the degree of control the tow maintained as opposed to the tug. That's crucial in the decision of that case. You know, sometimes the lawyers know the answers to something that is not evident from the record. There was a reduction in the fee award. I'm talking about the Ohio case. Did the court do that because it was redundant? Was that why they reduced the fee? I don't know. I do not know. There was nothing in the decision. They didn't explain why they did it. Is that going to be a problem for us? No, I think from my perspective, as I'm asking you to add it back because there's no basis for it to have been reducted. But if we don't know how they did it, how can we act on it? We're not going to live or die on $4,000. I mean, it's not the end of the world. All right. You don't have to answer that question. You may want to live or die. Okay. Well, my time's coming to an end. So I guess if you don't have any other questions for me, I don't want to belabor the points. I think the court fairly well understands what our position is here. And I would only ask in response, in ending that, and without being presumptuous, excuse me, in advance, but if the court is inclined to affirm that we'd be allowed a limited remand to reapply for whatever additional fees there might have been incurred that are applicable. Thank you, Your Honors. Rebuttal. Thank you, Your Honors. First, Ryan is viable and alive and vital, according to my opponent. And the Supreme Court continues to speak to it. What is critical is, since the effective date of the 1972 amendments, the United States Supreme Court has applied the Ryan Doctrine exactly zero times. But they could have intervened. They haven't. And you conceded. Ryan reaches employees not covered by the act. I don't concede that, Your Honor. I concede that other courts have found their way to do it. And this court found its way to do it 19 years ago. We said in Purnell in 1986 that Ryan still reaches employees not covered by the act. So why do you start off your rebuttal with that perception? I think, Your Honor, when this court and other courts have done that, you will find either no citation or a paucity of citations. So that's one concern I have. I don't hang my hat today and think our appeal should live or die on whether this court finds that Ryan is still alive. I think there is ample precedent, including the Supreme Court's own word, abolished in the Supreme Court's words. And this court itself. All in the context of the amendments, right? I mean, if you've got any citation for us where they say Ryan's done, it's finished, it's over, don't talk to us about it again, I'm sure in the reams of a briefing we got that would have been said, right? Correct, Your Honor. The problem is, as we know, the when my opponent says that Ryan has been cited by the Supreme Court as recently as 1996, well, yes, they mentioned it, but it said that it doesn't apply. The issue... To the issue that was before. The issue in the Lockheed case. Right. It wasn't a situation where it was squarely presented for the court to address it. It was Ingram just arguing that Ryan applied in a limited situation. I agree. Ryan applied in a limited situation where the ship could not obtain port indemnity against the employer. That's not the case here. Ingram was sued just like Mon River was. The district court could have apportioned since we were joint tort feasors, and since we settled, that should have been the end of it. Liability is... Mon River is assumed to have settled for its own negligence. That's what McDermott v. Amclyde holds. And under Boca Grande Club decided the very same day by the Supreme Court, it should therefore have been immune from suit. It's only this, what we believe is a application of Ryan in this setting, which has me here before you today, and which has my client exposed below to an additional $296,108.83 plus interest cents in Ingram's attorney's fees, not to mention Mon River's fees on top of what it paid, $1.2 million future value to settle, plus $200,000 in maintenance and cure, and then it settled again with Smith when this court remanded the case for a second settlement for about another $15,000. So what Ingram is looking for under the circumstances, I just don't feel is equitable. Do you have any better idea than he has as to why the reduction was imposed? In a few simple words, I mean, was it redundancy or... If you don't know, that's fine. I found, with all due respect to the district court, I found that there were a few issues in the district court's opinion, which I did not understand. That was one of them. Another one, which is an example of something that doesn't make sense, is for the district court to clearly enunciate these are the elements of a Ryan claim. It includes unseaworthiness exposure, then to find that there was none. I think you agree or you concede that if we were to affirm the main appeal, we should also reverse the $4,000 reduction. Your Honor, I agree. I'm not here to squabble over the $4,000 either. I think that is subsumed in the key issues. Sure. Thank you very much. The case is very well argued. We will take it under review. Thank you, Your Honors.